UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

        Plaintiff,

v.

        Case No. 14-20804
        Hon. John Corbett O'Meara

KAI XU,

        Defendant.

_____/

**DEFENDANT'S SENTENCING MEMORANDUM**

On April 12, 2016, this Court will sentence Defendant Kai Xu based upon his conviction for illegally exporting turtles out of the United States. Pursuant to a presentence report drafted by the Probation Department, the advisory guideline range for Defendant's crime is 57-71 months imprisonment. In advance of that hearing, Defendant raises two objections to the presentence report. First, Defendant objects to the government's contention that he purchased and/or sold over $1,500,000 worth of turtles. The evidence provided by the government to the probation office does not support a finding of more than $400,000 worth of turtles, much less $1.5 million, were sold by Defendant. Second, Defendant objects to the government's contention that the turtles he purchased and later exported exposed the general public to a significant risk of disease. While there are regulations that require quarantine of wildlife *imported* into the United States, Kai only purchased turtles from breeders in the United States for the purpose of exporting them to

China. Thus, the turtles were not required to be quarantined and pose no risk of disease to the public.

Irrespective of the advisory guideline range, Defendant respectfully requests that this Court sentence him to time served. At the time of sentencing, Defendant will have served approximately nineteen months in custody for what is essentially a regulatory offense. He deeply regrets his decision to make money by buying turtles in the United States and selling them to a buyer China in contravention of U.S. law and regulation. He readily admitted his crime once questioned by authorities, and during his nineteen-month detention, he has bettered himself and those around him. Kai Xu has paid his debt to society, and this Court should sentence him to time served, and allow him to be deported back to Canada.

**ARGUMENT**

I. **DEFENDANT DID NOT SELL MORE THAN $1,500,000 WORTH OF TURTLES OR RISK HARM TO THE PUBLIC BY EXPORTING TURTLES.**

   A. **DEFENDANT BOUGHT/SOLD LESS THAN $550,000 WORTH OF TURTLES.**

The Probation Office states in the presentence report that the "amount of money the defendant received from the sales [of turtles] exceeded $1,500,000.00." (PSR ¶ 32.) The government's evidence does not support that figure. To the contrary, the evidence shows that Kai never received anywhere close to that amount of money during the course of his turtle sales. The value of the turtles identified in the presentence report, an analysis of the bank account used by Kai, and Kai's own text messages show that he received less than $400,000.

### 1. The Market Price of the Turtles Identified In the Presentence Report is Less than $300,000

The presentence report identifies a number of turtles exported, or attempted to be exported by Kai. (PSR ¶¶ 12-22.) The report is based on the information provided to the probation office by the government relating to the offense conduct. As shown in the chart below, the estimated total aggregate value of the turtles identified in the presentence report is less than $300,000:

| Para. | Date | Turtles | Price (USD) | Source | Total |
|---|---|---|---|---|---|
| 12 | 4.22.14 | 21 Eastern Box | $1,050 | Market | $1,050 |
| 13 | 5.9.14 | 4 Black Pond Spotted<br>3 North American Wood<br>2 Yellow Blotch Map | $600<br>$1,500<br>$1,000 | Market<br>Iannelli Test. P. 33<br>Market | $3,100 |
| 14 | 6.11.14 | 16 Asian<br>38 Unknown | | | Unknown |
| 15 | 8.5.14 | 34 Eastern Box<br>10 Albino Red-Eared Sliders<br>7 Diamondback | $1,700<br>$6,500<br>$273 | Market<br>Iannelli Test. P.<br>Paragraph 16. | $8,473 |
| 16 | 9.4.14 | 2100 Diamondback | $82,000 | Paragraph 16. | $82,000 |
| 18 | 9.5.14 | 300 Diamondback and Red-Eared Sliders. | $30,000 | Paragraph 18. | $30,000 |
| 19 | 9.16.14 | 15 Eastern Box<br>20 Loggerhead Musk<br>30 North American Wood<br>10 Blanding<br>10 Kwangtung River<br>126 Diamondback | $750<br>$1,600<br>$15,000<br>$3,000<br>$10,000<br>$4,920 | Market<br>Market<br>Iannelli Test. P. 33<br>Iannelli Test. P. 33<br>Paragraph 19.<br>Paragraph 16. | $26,270 |
| 20 | 9.23.14 | 49 North American Wood<br>21 Kwangtung River<br>22 Blanding<br>100 Spotted<br>56 Albino Red-earned Sliders<br>754 Diamondback | $24,500<br>$21,000<br>$14,300<br>$15,000<br>$36,400<br>$29,441 | Iannelli Test. P. 33<br>Paragraph 19.<br>Iannelli Test. P. 33<br>Market<br>Iannelli Test. P. 33<br>Paragraph 16. | $140,641 |
| 22 | Total | | | | $283,061 |

The estimates above are based upon Agent Iannelli's testimony at Kai's detention hearing, the values provided to the probation department, and the

average market price based on an unofficial survey of turtle trade shows. Turtles are easily bred in captivity, therefore, they are not difficult to find or purchase in the United States, which, like China, has thousands of breeders and collectors. For example, the Michigan Reptile & Pet Expo has thousands of turtles for sale by breeders the "second Saturday of every month." (See Ex. A, photos from trade show.) At those trade shows, breeders sell the same type of turtles purchased by Kai. Id. In addition, breeders sell their turtles online and ship them throughout the country. (See Ex. B, screenshots from online turtle sales.)

The government seeks to hold Kai "accountable for an aggregate market value exceeding $1,500,000.00" in turtles purchased and sold. The aggregate market value of the turtles identified in the presentence report, however, falls far short of that number. The information provided to the probation department by the government reflects that Kai had a significant, but much smaller than alleged, turtle business.

> 2. **The Bank Account Used by Kai Shows that He Received $366,622.**

Since his arrest, Kai has acknowledged that he purchased turtles from breeders in the United States with the intent to sell them to a buyer in China. Originally, Kai attempted to bring the turtles across the border from the United States to Canada, so he could ship them to China. Kai's buyer in China suggested that bringing the turtles across the border was unnecessary and that Kai should simply ship them from the United States. To facilitate the turtle purchases, Kai's buyer advanced the money used to buy the turtles.

During the course of its investigation, the government obtained records related to the account used by Kai to receive money from his turtle buyer in China. Agents distilled that information and created a spreadsheet showing how much money was received through the account. (Ex. C, Spreadsheet.)  The Account is in the name of Kai's father, Hong Xu, who spends considerable time in China and who was unaware of Kai's turtle trade or the money flowing through this particular account.

Assuming that all of the transactions identified in the spreadsheet actually related to the turtle trade, the total amount received by Kai from the buyer was $366,622.  That amount is consistent with the market value of the turtles identified in the presentence report, and nowhere close to the $1.5 million figure alleged by the government.

> 3. **The Text Messages Obtained by the Government During the Court of Kai Xu's Proffer Show Less than $550,000 Worth of Turtles.**

The government has suggested that messages provided by Kai to the government during his proffer support its theory that he purchased or sold more than $1,500,000 worth of turtles.  During the course of a two-day proffer that occurred shortly after his arraignment, Kai answered hundreds of questions posed to him by Agents from the U.S. Fish and Wildlife Service. In addition to identifying every person with whom he bought or sold turtles, Kai also provided his text or chat messages to the government.   He did so by divulging his passcode on his Apple

IPhone 5S to the government agents so that they could search his phone, which, they could not have otherwise searched.[1]

Kai willingly provided valuable assistance to the government by providing information about his activities with others. Despite that assistance, the government has declined to file a motion for downward departure. Further, the government now seeks to use that information against him by providing the Court with a flawed translation of the messages between him and his buyer, which were all written in Chinese. (See Ex. D; Spreadsheets of texts and translation.)

In a series of disjointed messages, Kai and his buyer discuss prices for various turtles and the money that the buyer would be willing to pay. Nearly all of the prices relate to Chinese currency, the Yuan, which currently has an exchange rate of over six Yuan to every dollar. To the extent that Kai or the buyer discussed prices in US dollars they would typically refer to the words "US dollars." (See Ex D, line 58656: "He was selling for $1,500 US dollars a piece; line 58912: "We have ones for $500 US Dollars"; line 59236: "Price is $76.99 US Dollars"; line 59700: "$1,200 US Dollars a piece."

---

[1] The government now seeks to use the information provided during Kai's proffer against him arguing that they made "derivative use" of his proffer statement to obtain his messages. The government contends that they had a search warrant to search his IPhone and simply needed Kai to divulge his passcode to execute the search warrant. By using his voluntarily provided passcode to open his IPhone they maintain that they made derivative use of his proffer. This is not derivative use. *See, e.g., United States v. Scott*, 12 F. Supp 3d 298, 303-304 (Dist. Mass. 2014) (Using documents obtained through a proffer to get a search warrant to obtain the same documents is not derivative use.). This Court should not consider information obtained through Kai's proffer, but even if it does, that information does not support the government's claims.

Despite the absence of the words US dollars or the US dollar sign ($) in the text, the government's translator erroneously added a US dollar sign ($) after nearly every number found in the messages, even when it is clear that the written Chinese text refers to Yuan.  For example, Line 58742 of the text messages references prices for certain turtles, including "3,600" for Albino Red-eared Sliders.   During Special Agent Mona Ianelli's testimony at Kai's detention hearing, she testified that "albino red eared sliders . . . sell for $650."   (Ex. E, Det. Hearing p. 33.) Given that the exchange rate of Yuan to Dollar is about six to one, the price discussed for Albino Red-eared Sliders obviously is in Yuan.  Nevertheless, the government's translation lists it as US dollars.

Indeed, the translation is much worse than mere confusion between currencies.  On at least one occasion, the English translation incorrectly refers to numbers as currency when they clearly have nothing to do with currency.  On line 58844, Kai and his buyer are speaking about a zip code in china where a package should be sent.  (See Ex. D, Line 58844.)  The buyer states that it is located at "510378," which the translator interpreted to mean "$510,378."

Even when the parties to the messages specifically identify the type of currency to which they refer, the translator still mistakenly refers to Yuan as US dollars.  (See Line 61993:  "25-30 Red-necked Turtles . . . $16,500 Chinese Yuan. . .") Indeed, when the discussing the *total* amount of money received by Kai from the buyer over the course of their dealings, Kai's buyer acknowledged he sent "1,756,200 Chinese Yuan." (See line 61837).  Despite specifically identifying the transaction in "Yuan," the translator still places a US dollar sign in front of that

figure.  1,756,200 Chinese Yuan is worth about $283,258 US dollars, which is amount is consistent with all the other evidence that Kai did not buy/sell more than $400,000 USD worth of turtles.

The text messages obtained through Kai's proffer are written in Chinese, and the English translation provided by the government is inaccurate and should not be relied upon by this Court to find that Kai received over $1,500,000. This Court should give the messages little weight.  Even if it does, Kai asks that it recognize that the figures referenced in the messages refer to Chinese Yuan and not US dollars, which support a finding of less than $300,000 in turtle value.

> **B.     DEFENDANT DID NOT HARM THE PUBLIC BY EXPORTING TURTLES BOUGHT FROM BREEDERS OUTSIDE THE UNITED STATES.**

Pursuant to USSG 2Q2.1(b)(2), a two-level guideline enhancement applies if the Court finds that a defendant "created a significant risk of infestation or disease transmission potentially harmful to humans, fish, wildlife, or plants."  USSG 2Q2.1(b)(2).  The government points to regulations requiring the quarantine of wildlife prior to entering the United States.  The government claims that by selling turtles without a permit, Kai violated 42 C.F.R. § 71.52, which regulates turtle importation.  Kai, however, did not import turtles from China, he exported them to China.[2]  The purpose of the regulation is to stop turtles from entering our boundaries without first being quarantined and checked for disease.

---

[2] To the extent the government argues that Kai worked with others who illegally imported turtles into the United States, Kai did not order, request or suggest to anyone that they do so.  Kai's focus was solely on selling turtles to his buyer in China.

The government relies on *United States v. Eyoum*, 84 F.3d 1004 (7th Cir. 1996) for the proposition that Kai's sale of turtles was a health risk. In *Eyoum*, the defendant was convicted of the illegal importation of turtles from Tanzania. In affirming the District Court's finding that the defendant's conduct was a health risk, the Seventh Circuit held, "[t]he public health regulation itself represents an administrative finding that the commercial importation of small turtles--because they are likely to be sold as pets for children--creates a significant risk of disease to humans. The district court was entitled to rely on this regulatory conclusion to support the two-level enhancement in Eyoum's sentence."

Unlike the defendant in *Eyoum*, Kai bought turtles from breeders in the United States and was exporting them to China. There was no risk that children would intercept the packages, open them up and become infected with Salmonella or any other disease. The purpose of that regulation is to protect the public from diseased turtles or other wildlife entering the United States. Where, as here, the wildlife is shipped out of the country, that government regulation is not violated.

## II.   THIS COURT SHOULD VARY DOWNWARD FROM THE ADVISORY GUIDELINES RANGE.

Should the Court determine that the adjusted guideline range is above the nineteen months Kai has already served in custody, he respectfully requests that the Court vary downward and sentence him to time served. Kai is not your typical federal detainee. At the time of his offense, Kai Xu was an engineering student at the University of Waterloo. He is highly intelligent, well-educated and speaks several languages. He has no criminal history.

Despite being an unlikely federal felon, Kai acknowledges that he committed a crime and recognizes that he must be punished. In a letter submitted to this Court, Kai explains, but does not attempt to justify, his horrible lapse in judgment in committing this crime. (Ex. F, Letter from Kai Xu.) He is deeply remorseful for his actions. He is a good student and has plans to marry his fiancée as soon as possible because the original date of their wedding has passed. Kai intends to return to Canada after his term of incarceration and has no plans to return to United States.

Kai has spent nineteen months in the Milan Detention Center waiting to plead guilty and be sentenced by this Court. At no time, did he ever suggest to his attorneys that he wished to go to trial or otherwise challenge his guilt. At the time of his arraignment, he submitted to a proffer which took place over the course of two days. He has been separated from his parents, his fiancée and his home. In addition, Kai has been the subject of national ridicule as the man who tried to smuggle turtles in his pants into Canada. This Court should consider sentencing him to time served. Irrespective of the guidelines, nineteen months in custody is sufficient punishment in this case.[3]

---

[3] A brief survey of other "turtle" smuggling cases throughout the country shows that 19 months in custody would be on the high end of sentencing for conduct similar to Kai's.

| Case Number/Name | Jurisdiction | Charge/Statute | Sentence |
|---|---|---|---|
| 2:2013-cr-00138 United States v. Swanson | Western District of Washington | Conspiracy to smuggle wildlife out of the United States 18 USC § 554 | 12 months in prison and 3 years of supervised release. |
| 2:2011-cr-00082 United States of America v. Yamagami et al, | Central District of California | Importing wildlife into the United States (3 counts) 18 U.S.C. § 545 | 21 months in prison, 2 years of supervised release, $18,403 fine. |
| 8:2012-cr-00376 United States of America v. Terrance | Northern District of New York | Conspiracy to Export wildlife from the United States into Canada 18 U.S.C. § 371 | 18 months in jail, 3 years of supervised release. |

To his credit, Kai has never suggested that he should avoid punishment for this crime. He has always accepted responsibility for his actions, and while in jail he has bettered himself and others.  In a letter to this Court, another inmate at Milan, Ruben Moran took the time to tell this Court that "there is a difference between Mr. Kai Xu and the rest."  (Ex. G, Letter from Moran.)  Mr. Moran notes that "there are about 15 Hispanic inmates" that Kai helps with "translating to the guards, checking the computer account, accessing the phones and applying our visit forms."

Kai's willingness to assist his fellow inmates is a sign of his strong character. His ability to learn Spanish so that he can help them is a testament to his intelligence and ability to adapt to different situations.  Kai Xu has paid his debt to society, and this Court should have no concern that he will ever run afoul of the law again.  This Court should sentence him to time served.


Dated:  April 5, 2016                                  Respectfully Submitted,

                                                                    s/ Matthew G. Borgula
                                                                    Matthew G. Borgula (P57330)
                                                                    Springstead Bartish & Borgula Law, PLLC
                                                                    15 Ionia, Suite 520
                                                                    Grand Rapids, Michigan 49503
                                                                    (616) 458-5500
                                                                    matt@springsteadbartish.com


| | | | |
|---|---|---|---|
| 2:2014-cr-00339 United States of America v. Cheung | Central District of California | Mislabeling wildlife intended for foreign commerce Lacey Act: 16 U.S.C. § 3371-3378 | 2 months in federal prison, 2 years of supervised release, 500 hours community service, $12,000 in fines. |
| 2:2014-cr-00181 United States of America v. Treigle, | Eastern District of Louisiana | Conspiracy to smuggle wildlife out of the United States 18 USC § 554 Lacey Act: 16 U.S.C. § 3371-3378 | 15 months in federal prison, 2 years of supervised release. |